## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

---

|  |  |  |
|---|---|---|
| DANIEL DIBA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 20-0240 (ABJ) |
| | ) | |
| ISLAMIC REPUBLIC OF IRAN, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

---

## <u>MEMORANDUM OPINION</u>

On January 29, 2020, plaintiff Daniel Diba, a naturalized United States citizen, brought this action against defendants the Islamic Republic of Iran, the Islamic Revolutionary Guard Corps ("IRGC") (collectively, "Iran"); and Seyed Ali Hosseini Khamenei and Hossein Salami ("Individual Defendants"), pursuant to the Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1602-1611, and the Torture Victim Protection Act of 1991, 28 U.S.C. § 1350.  Compl. [Dkt. # 1] ¶ 1. This complaint arises out of the detention and torture of plaintiff by the Iranian government from March 2007 until approximately March 2010, and it seeks damages for the injuries he sustained and the pain he continues to endure.  Compl. ¶¶ 15, 44, 98–105.  Defendants have not appeared to defend their conduct on these claims, so plaintiff has filed a Motion for Default Judgment [Dkt. # 26] ("Mot.").  Because the Court finds that it does not have subject matter jurisdiction under the Foreign Sovereign Immunities Act ("FSIA") or personal jurisdiction over the Individual Defendants to consider the Torture Victim Protection Act ("TVPA") claim against them, the Court will **DENY** plaintiff's motion for default judgment.  This ruling is based on technical legal grounds, and it should not be read to suggest in any way that plaintiff has not suffered enormously at the hands of the Iranian government.

## BACKGROUND

The summary below is based on the allegations in the complaint, declarations from plaintiff and other individuals – including his physician and family members – who have personal knowledge of the relevant events, reports submitted by experts on Iran, and documentary evidence supplied by plaintiff in support of his motion.

Plaintiff Daniel Diba is a naturalized United States citizen.  Decl. of Daniel Diba, Ex. 1 to Mot. [Dkt. # 26-3] ("Diba Decl.") ¶ 1; Certificate of Naturalization, Ex. 2 to Mot. [Dkt. # 26-4]; Compl. ¶ 55.  He previously resided in Iran, where he worked as a businessman and imported cosmetic products.  Compl. ¶ 11; Diba Decl. ¶ 7.  In December of 2006, plaintiff was approached by three plainclothes IRGC agents who told him he had to "accept . . . them as . . . partners and give them 52% of [his] business," if he wished to remain in business.  Diba Decl. ¶ 10; *see* Compl. ¶¶ 12–13.  Plaintiff refused and asked the agents to leave his office.  Compl. ¶ 14; Diba Decl. ¶ 10.

In March 2007, as plaintiff filmed a group of people who were protesting against government policies near his business, a "few individuals grabbed him and forced him into a van." Compl. ¶ 15; Diba Decl. ¶ 11.  Plaintiff was blindfolded and one of his captors hit him in the face with a gun stock, which broke his nose.  Diba Decl. ¶ 11.  Diba's captors, whom he learned were IRGC agents, then took him to a black site, where they beat him and interrogated him about why he was filming the protest and whether he had any dealings with foreign media or intelligence agencies.  Compl. ¶¶ 16–17; Diba Decl. ¶ 11.  The IRGC agents also "searched Mr. Diba's office and confiscated every computer and document."  Compl. ¶ 18; Diba Decl. ¶ 12.

After three days of interrogation, plaintiff was transferred to the Special Intelligence Court where, without a lawyer present, he was charged with bribery, spying, unlawful importation, and

foreign exchange manipulation. Compl. ¶¶ 20–25; Diba Decl. ¶ 13. Plaintiff was then taken to the Ghezel Hesar Detention Center and placed in solitary confinement. Compl. ¶ 26; Diba Decl. ¶ 16. After five days, he was taken to the Central Unit of Intelligence and Security, where he was "repeatedly interrogated, abused and tortured." Compl. ¶ 26; Diba Decl. ¶ 16. Plaintiff was placed in a solitary confinement cell, so small he could not stand or lie down. Compl. ¶¶ 28, 30; Diba Decl. ¶ 19. During the day, he was "beaten badly by interrogators with cables," and suspended from the ceiling by his arms. Compl. ¶ 29; Diba Decl. ¶ 19. "His torturers used a gas cylinder to apply heat to Mr. Diba's testicles, threatening that they wanted to cook them up." Compl. ¶ 29; Diba Decl. ¶ 19. This torture continued for at least three months, occurring approximately every other day and sometimes twice a week. Compl. ¶ 31; Diba Decl. ¶ 21.[1]

Plaintiff was then transferred to the Counter-Intelligence Unit, where his torture continued. Compl. ¶¶ 31–32; Diba Decl. ¶ 22. His captors denied him water, broke his nose four times, pulled his nails, and hung him on the ceiling by his hands for over an hour every day. Compl. ¶ 32; Diba Decl. ¶ 22. "[H]e attempted suicide three times." Compl. ¶ 32. Diba lost approximately 90 pounds during this time period. Compl. ¶ 34.

Around August of 2007, plaintiff's captors injected him with a chemical that was meant to facilitate a confession against his will. Compl. ¶ 35; Diba Decl. ¶¶ 25–27.[2] This chemical "caused

---

[1]    In the complaint, plaintiff alleges that this "physical and mental torture continued over four months." Compl. ¶ 31. But in plaintiff's declaration, he avers that this "physical and mental torture went on for three months." Diba Decl. ¶ 21.

[2]    Although the complaint alleges that Diba was injected with a chemical "[a]t the end of 2010," Compl. ¶ 35, plaintiff avers in his declaration that he was hospitalized in August 2007 following the chemical injection, Diba Decl. ¶¶ 25–27, and his hospital records note he was treated in 2007. Loghman Hosp. Rs. for Suicide Attempt, Ex. 13 to Mot. [Dkt. # 26-15] at 2; Razi Hosp. Rs. for Chem. Torture, Ex. 14 to Mot. [Dkt. # 26-16] at 3; *see also* Mot. at 5–6 (noting that plaintiff was kept in Loghman Hospital following his treatment for the chemical torture and suicide attempt).

his body to feel as though every cell was burning from inside," and resulted in his entire body badly blistering.  Compl. ¶ 35; Diba Decl. ¶ 25; *see also* The Pictures of Daniel Diba, Ex. 15 to Mot. [Dkt. # 26-17].  Diba lost consciousness, and was taken to a hospital where he remained in a coma for fourteen days.  Compl. ¶ 36; Diba Decl. ¶ 25.  While at the hospital, Diba learned that his house, car, personal belongings, as well as a parcel of land he owned in western Tehran, had been confiscated.  Compl. ¶ 37; Diba Decl. ¶ 44.  In addition to his property, the combined value of which was worth over $3.3 million, Diba lost his business, which yielded him an income of $800,000 to $1,000,000 per year.  Compl. ¶ 38; Diba Decl. ¶ 44.  Diba paid approximately $200,000 in hospital bills over the next six months and given his physical and emotional state, he reports that he "looked for an opportunity to kill himself."  Compl. ¶ 39; Diba Decl. ¶ 44.  When "his captors attempted to return him to the IRGC Counter-Intelligence Unit, [] he took hundreds of pills in an attempt to end his life rather than be taken back to that 'hell hole.'"  Compl. ¶ 41; Diba Decl. ¶ 23.

Four days after this suicide attempt, in approximately October of 2007, *see* Loghman Hospital Rs. for Suicide Attempt at 2, Diba was released from the hospital and from further detention on the condition that he refrain from contacting the media.  Compl. ¶ 42; Diba Decl. ¶ 31.  But in March 2010, he was again captured and interrogated.  Compl. ¶ 44; Diba Decl. ¶ 33.  This time, Diba "agreed to confess to whatever [the Iranian government] wanted as long as he would not be tortured," and he signed a statement that incriminated high ranking officials.  Compl. ¶ 45; Diba Decl. ¶ 33.  After Iran released him on a $400,000 bail and confiscated nearly $2,000,000 of his business capital, Diba escaped to Turkey where he was granted refugee status.  Compl. ¶¶ 46–47; Diba Decl. ¶¶ 34–35.  Diba moved to the United States as a political refugee in 2013, and he

became a naturalized U.S. citizen in March 2019.  Compl. ¶ 55; Diba Decl. ¶ 36; Certificate of Naturalization.

Diba suffers extensive and ongoing pain and psychological problems as a result of his detention and torture.  The pain affects "virtually all parts of his body," and "will likely continue throughout his life."  Decl. of Faro Ted Owiesy, M.D., Ex. 11 to Mot. [Dkt. # 26-13] ¶ 15; *see also* Compl. ¶ 49 (listing conditions currently afflicting plaintiff as a result of his torture:  "post-traumatic stress disorder (chronic), pain disorder . . . with related psychological factors, Hematemesis, Rheumatoid polyneuropathy with rheumatoid arthritis, spinal stenosis, Rheumatoid vasculitis with rheumatoid arthritis, inflammatory polyneuropathy, duodenitis with bleeding, spinal enthesopathy, major depressive disorder, anxiety disorder, transient cerebral ischemic attack, lack of coordination, speech disturbances, panic disorder (episodic paroxysmal anxiety), gastritis with bleeding, pain in joints, ulcerative colitis, fibromyalgia, and diverticulitis of large intestine without perforation").

Plaintiff filed a complaint in this court on January 29, 2020.  *See* Compl.  It consists of eight counts, which allege:  (I) a private right of action under the FSIA against Iran pursuant to 28 U.S.C. § 1605A(c);  (II) assault and battery under the FSIA against Iran;  (III) false imprisonment under the FSIA against Iran;  (IV) hostage-taking under the FSIA against Iran; (V) torture under the TVPA against the Individual Defendants;  (VI) loss of property under the FSIA against Iran;  (VII) intentional infliction of emotional distress under the FSIA against Iran; and (VIII) punitive damages under the FSIA against Iran.  Compl. ¶¶ 50–97.  Plaintiff seeks compensatory, economic, and punitive damages against all defendants.  Compl. ¶¶ 98–105.

## STANDARD OF REVIEW

Federal Rule of Civil Procedure 55(a) provides that the Clerk of the Court must enter a party's default "[w]hen a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise."[3]   And under Rule 55(b)(2), the Court may consider entering default judgment when a party applies for that relief.  *See* Fed. R. Civ. P. 55(b)(2).  Because "strong policies favor the resolution of genuine disputes on their merits," "[t]he default judgment must normally be viewed as available only when the adversary process has been halted because of an essentially unresponsive party."  *Jackson v. Beech*, 636 F.2d 831, 832, 836 (D.C. Cir. 1980), citing *H. F. Livermore Corp. v. Aktiengesellschaft Gebruder Loepfe*, 432 F.2d 689, 691 (D.C. Cir. 1970).

Under the Foreign Sovereign Immunities Act, a court may not enter default judgment against a foreign state "unless the claimant establishes his claim or right to relief by evidence satisfactory to the court."  28 U.S.C. § 1608(e)[4]; *Han Kim v. Democratic People's Republic of Korea*, 774 F.3d 1044, 1047 (D.C. Cir. 2014) ("[W]hen the defendant State fails to appear and the

---

[3]      The Clerk of the Court has entered defendants' default.  *See* Clerk's Entry of Default as to Islamic Republic of Iran [Dkt. # 16] (entered January 20, 2021); Clerk's Entry of Default as to Hossein Salami [Dkt. # 23] (entered May 4, 2021); Clerk's Entry of Default as to Seyed Ali Hosseini Khamenei [Dkt. # 24] (entered May 4, 2021).  This means the factual allegations in the complaint are taken as true.  *See Int'l Painters & Allied Trades Indus. Pension Fund v. R.W. Amrine Drywall Co.*, 239 F. Supp. 2d 26, 30 (D.D.C. 2002).  Plaintiff filed a motion for default judgment on July 28, 2021.  *See* Mot.

[4]      28 U.S.C. § 1608(e) states, in full, that:

> No judgment by default shall be entered by a court of the United States or of a State against a foreign state, a political subdivision thereof, or an agency or instrumentality of a foreign state, unless the claimant establishes his claim or right to relief by evidence satisfactory to the court.  A copy of any such default judgment shall be sent to the foreign state or political subdivision in the manner prescribed for service in this section.

6

plaintiff seeks a default judgment, the FSIA leaves it to the court to determine precisely how much and what kinds of evidence the plaintiff must provide, requiring only that it be 'satisfactory to the court.'").[5]   Default judgment under the FSIA is identical to the standard for entry of default judgments against the United States under Federal Rule of Civil Procedure 55(d).   *Hill v. Republic of Iraq*, 328 F.3d 680, 683 (D.C. Cir. 2003), quoting H.R. Rep. No. 94-1487, at 26 (1976), *as reprinted in* 1976 U.S.C.C.A.N. 6604, 6625.   But "the entry of a default judgment is not automatic," *Mwani v. bin Laden*, 417 F.3d 1, 6 (D.C. Cir. 2005) (footnote omitted), and according to the binding law in this circuit, a court must first be satisfied that it has subject matter jurisdiction over the action, *Khadr v. United States*, 529 F.3d 1112, 1115 (D.C. Cir. 2008), as well as personal jurisdiction over the defendant.   *See Mwani*, 417 F.3d at 6 ("The district court correctly noted that the entry of a default judgment is not automatic, and that a court should satisfy itself that it has personal jurisdiction before entering judgment against an absent defendant."); *Kaplan v. Cent. Bank of the Islamic Republic of Iran*, 896 F.3d 501, 511 (D.C. Cir. 2018) ("[D]efendants never entered an appearance.   Their absence imposed an independent obligation on the district court to satisfy itself of its personal jurisdiction before entering a default judgment against a missing party."); *see also* 10A Charles Alan Wright et al., Federal Practice and Procedure § 2682 (3d ed. 1998) ("Before a default can be entered, the court must have subject-matter jurisdiction and jurisdiction over the party against whom the judgment is sought."); *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994) (federal courts are courts of limited jurisdiction and possess "only that power authorized by Constitution and statute"); *NetworkIP, LLC v. FCC*,

---

5      As the D.C. Circuit has explained, "[w]ith these provisions, Congress aimed to prevent state sponsors of terrorism—entities particularly unlikely to submit to this country's laws—from escaping liability for their sins."   *Han Kim*, 774 F.3d at 1048, citing 28 U.S.C. § 1608(e).

548 F.3d 116, 120 (D.C. Cir. 2008) (the district court is "forbidden—as a court of limited jurisdiction—from acting beyond [its] authority").

## ANALYSIS

Because the Court finds that it does not have subject matter jurisdiction to consider plaintiff's claims under the Foreign Sovereign Immunities Act or personal jurisdiction over the Individual Defendants to consider his claim under the Torture Victim Protection Act, it must deny plaintiff's motion for default judgment.

I. **The Court does not have subject matter jurisdiction to consider plaintiff's claims under the Foreign Sovereign Immunities Act.**

Seven of the eight counts in the complaint seek money damages under the Foreign Sovereign Immunities Act.  *See* Compl. ¶¶ 50–77, 83–97 (Counts I, II, III, IV, VI, VII, and VIII). Unless a foreign state has immunity under sections 1605 to 1607 of the FSIA or pursuant to an international agreement, a district court has "original jurisdiction without regard to amount in controversy of any nonjury civil action against a foreign state[.]"   28 U.S.C. § 1330(a). Section 1605A states that:

> [a] foreign state shall not be immune from the jurisdiction of courts of the United States . . . in any case . . . in which money damages are sought against a foreign state for personal injury or death that was caused by an act of torture  .  .  .  if such act or provision of material support or resources is engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency.

28 U.S.C. § 1605A(a)(1).   To hear a claim brought under section 1605A, the claimant must establish that "(i) the foreign country was designated a 'state sponsor of terrorism at the time [of] the act,' (ii) the 'claimant or the victim was' a 'national of the United States' at that time, and (iii) the 'claimant has afforded the foreign state a reasonable opportunity to arbitrate the claim.'"

*Mohammadi v. Islamic Republic of Iran*, 782 F.3d 9, 14 (D.C. Cir. 2015), quoting 28 U.S.C. § 1605A(a)(2).

Plaintiff satisfies the first and third elements: "Iran has been designated a state sponsor of terrorism since 1984." *Mohammadi*, 782 F.3d at 14; *see* Determination Pursuant to Section 6(i) of the Export Administration Act of 1979—Iran, 49 Fed. Reg. 2836-02; *see also* Compl. ¶ 93. And plaintiff conveyed an Offer to Arbitrate to Iran's Ambassador to the United Nations and to the Interests Section of the Islamic Republic of Iran in Washington, D.C. *See* Offer to Arbitrate, Ex. 10 to Mot. [Dkt. # 26-12]. However, plaintiff cannot satisfy the second element, as he was not a United States national when Iran detained and tortured him.

Only United States citizens and nationals may rely on the FSIA's grant of subject matter jurisdiction, and the victim in an action against a state sponsor for terrorism must have been a United States citizen or national *at the time of* the incident that gave rise to the claim. "The sole [] statutory provision that presently confers United States nationality upon non-citizens is 8 U.S.C. § 1408," *Mohammadi*, 782 F.3d at 15, and plaintiff does not claim to qualify as a United States national under this provision. Rather, plaintiff argues that defendants have committed "continuing violations" that affect him now and have done so throughout the period since he became a U.S. citizen; as he puts it, the torture "continue[s] to persist and cause new injuries to Mr. Diba to the present day." Mot. at 34.

The Court does not wish to minimize plaintiff's pain in any way or imply that he does not or will not continue to suffer the consequences of his prolonged confinement and brutal torture. However, the alleged ongoing harm, which plaintiff characterizes as "continuing violations," does not fit within the definition of "torture" under the FSIA.

The term "torture" is defined as:

> **[A]ny act, directed against an individual in the offender's custody
> or physical control**, by which severe pain or suffering (other than pain
> or suffering arising only from or inherent in, or incidental to, lawful
> sanctions), whether physical or mental, is intentionally inflicted on that
> individual for such purposes as obtaining from that individual or a third
> person information or a confession, punishing that individual for an act
> that individual or a third person has committed or is suspected of having
> committed, intimidating or coercing that individual or a third person, or
> for any reason based on discrimination of any kind[.]

Pub. L. No. 102-256, § 3(b)(1), 106 Stat. 73 (1992), codified at 28 U.S.C. § 1350 note § 3(b)

(emphasis added); *see* 28 U.S.C. § 1605A(h)(7). Thus the statute contemplates an "act" – not a

new consequence of a past event. And more important, for that act to be considered "torture"

under the FSIA, the plaintiff must be "in the offender's custody or physical control" *at the time*

the act "is intentionally inflicted." *See Mohammadi*, 782 F.3d at 13 (upholding district court

finding "that plaintiffs failed to qualify as United States 'nationals' at the time of the relevant acts

in Iran, and that any acts postdating plaintiffs' relocation to the United States failed to constitute

'torture' within the meaning of the statute"); *Jerez v. Republic of Cuba*, 777 F. Supp. 2d 6, 24–25

(D.D.C. 2011) (magistrate judge opinion, referred for resolution pursuant to Local Civil Rule 72.2)

(plaintiff's complaint about torturous acts that occurred in Cuba, while plaintiff was a Cuban

citizen, "would not support a waiver of sovereign immunity pursuant to Section 1605(a)(7)"

because plaintiff was not a U.S. national at the time), *objections overruled*, 964 F. Supp. 2d 52

(D.D.C. 2013), *aff'd*, 775 F.3d 419 (D.C. Cir. 2014). Here, plaintiff has been released from Iran's

custody or physical control since at least 2010 – approximately three years before he moved to the

United States as a political refugee in 2013, and nine years before he became a naturalized U.S.

citizen in 2019. Compl. ¶ 55; Certificate of Naturalization. Even though it is well-documented

that plaintiff has continued to experience pain and new complications resulting from his inhumane

treatment, those developments did not arise while he was in Iran's custody or physical control.

Because plaintiff was not a national or citizen of the United States at the time of his torture in Iran, and any "continuing violations" he has experienced since leaving Iran are not acts directed at him while in Iran's custody or physical control, the Court lacks the authority to consider plaintiff's claims brought under the FSIA.  Therefore, those claims must be dismissed for lack of subject matter jurisdiction.

II.   **The Court does not have personal jurisdiction over Khamenei and Salami that would enable it to consider plaintiff's claim under the Torture Victim Protection Act.**

In Count V, plaintiff seeks damages pursuant to the Torture Victim Protection Act of 1991 against Seyed Ali Hosseini Khamenei and Hossein Salami, the Individual Defendants. Compl. ¶¶ 78–82.  Plaintiff alleges that Khamenei, Iran's Supreme Leader and "the most powerful political authority in the country," had "direct control over the executive, legislative and judicial branches of government, as well as the military and media," Compl. ¶ 8, and that Salami, the Commander-in-Chief of IRGC, is "personally liable for acts of IRGC agents in torturing the [p]laintiff."  Compl. ¶ 10.  Count V of the complaint alleges that Khamenei and Salami violated the TVPA because they subjected plaintiff to torture under actual or apparent authority of law. Compl. ¶ 79.  While in the custody of Khamenei and Salami, plaintiff claims he was "physically tortured through beatings, deprivation of food and water, and other methods, in addition to the administration of mind altering [sic] substances."  Compl. ¶ 81.  Plaintiff argues that his treatment fits the definition of torture under the TVPA, *see* 28 U.S.C. § 1350 note § 3(b), and therefore he is entitled to compensatory and punitive damages from Khamenei and Salami under the statute. Mot. at 10–26; *see also* Compl. ¶ 82.

Plaintiff makes it clear in his motion that he is suing Khamenei and Salami in their official, and not personal, capacities.  *See* Mot. at 11 ("Defendant Seyed Ali Hosseini Khamenei and

11

Hossein Salami are both officials of the Iranian government. . . . All operations of unlawful detention, hostage-taking, and torture by the IRGC are done with the general authorization and knowledge of Defendants Khamenei and Salami."); *id.* at 9–10 ("Defendants Khamenei and Salami are named in this suit for their roles in Iran's use of torture and support of terrorism, as well as their active opposition to the U.S. and targeting of individuals accused of espionage on behalf of the United States.  Defendants' targeting of such individuals, including Mr. Diba, represents Defendants' intent to purposefully engage with and have a direct impact upon the United States.") (footnote omitted).

<blockquote>a. <strong>Subject Matter Jurisdiction</strong></blockquote>

The TVPA was enacted to create "a civil action for recovery of damages from an individual who engages in torture or extrajudicial killing."  Pub. L. No. 102-256, 106 Stat. 73 (1992).  It states:

> (a)  Liability.—An individual who, under actual or apparent authority, or color of law, of any foreign nation—
>
> > (1) subjects an individual to torture shall, in a civil action, be liable for damages to that individual[.]

28 U.S.C. § 1350 note § 2(a)(1).

The TVPA claim itself does not provide the court with subject matter jurisdiction; jurisdiction can vest under either the Alien Tort Claims Act, 28 U.S.C. § 1350, or the federal question provision, 28 U.S.C. § 1331.  28 U.S.C. § 1350 note § 2(a); *see Romero v. Drummond Co.*, 552 F.3d 1303, 1315 (11th Cir. 2008) ("[T]he Torture Act provides a cause of action for torture and extrajudicial killing but does not grant jurisdiction.  Federal courts are empowered to entertain complaints under the Torture Act when either the Alien Tort Statute or the federal question statute, 28 U.S.C. § 1331, provides jurisdiction.") (internal citation omitted); *see also Jerez*, 777 F. Supp. 2d at 18, citing *Arndt v. UBS AG*, 342 F. Supp. 132, 141 (E.D.N.Y. 2004).

Moreover, the Torture Victim Protection Act only supports claims brought against individuals, and not foreign states.  28 U.S.C. § 1350 note § 2(a); *Jesner v. Arab Bank, PLC*, 138 S. Ct. 1386, 1404 (2018) ("The key feature of the TVPA . . . is that it limits liability to 'individuals,' which, the Court has held, unambiguously limits liability to natural persons.").  The defendant "bears the burden of proving foreign official immunity," and the issue is "governed by the common law."  *Lewis v. Mutond*, 918 F.3d 142, 145 (D.C. Cir. 2019).  And under the common law, "head of state immunity survived enactment of the TVPA."  *Manoharan v. Rajapaksa*, 711 F.3d 178, 180 (D.C. Cir. 2013) (upholding district court finding that the sitting president of Sri Lanka was immune from civil suit under the TVPA); *see also* H.R. Rep. No. 102–367, at 5 (1991), *reprinted in* 1992 U.S.C.C.A.N. 84, 88 ("[N]othing in the TVPA overrides the doctrines of diplomatic and head of state immunity.").

In *Samantar v. Yousuf*, 560 U.S. 305 (2010), the Supreme Court held that the FSIA – which immunizes foreign states from the jurisdiction of U.S. courts – does not define "foreign state" to include "an official acting on behalf of the foreign state."  *Id.* at 319 (finding that a high-ranking government official could be held liable for torture under the TVPA).  However, the Court cautioned that "some actions against an official in his official capacity should be treated as actions against the foreign state itself, as the state is the real party in interest."  *Id.* at 325.

While the allegations in the complaint could support a determination that Khamenei, Iran's Supreme Leader, acting as alleged, in his official capacity, is indistinguishable from the Islamic Republic of Iran, *see* Compl. ¶ 8 ("Khamenei had direct control over the executive, legislative and judicial branches of government, as well as the military and media."), and therefore it is questionable whether the Court has subject matter jurisdiction to hear the claims against him, that cannot be said about Salami, the Commander in Chief of the IRGC.  Therefore, the Court must go

13

on to determine whether it has personal jurisdiction over Salami, and it will do so in an abundance of caution with respect to Khamenei as well.

  b. **Personal Jurisdiction**

   "Before a federal court may exercise personal jurisdiction over a defendant, the procedural requirement of service of summons must be satisfied." *Mwani*, 417 F.3d at 8, quoting *Omni Capital Int'l, Ltd. v. Rudolf Wolff & Co.*, 484 U.S. 97, 104 (1987). Once that has been shown, the court must "satisfy itself that it has personal jurisdiction before entering judgment against an absent defendant."[6] *Mwani*, 417 F.3d at 6. This requires plaintiffs to make a "prima facie showing of jurisdiction," *id.*, by showing that there is "constitutionally sufficient relationship between the defendant and the forum." *Id.* at 8, quoting *Omni Capital*, 484 U.S. at 104. The court may consider whether there is "an applicable long-arm statute" that authorizes service on the defendants, *id.*, or, if "the defendant is not subject to jurisdiction in any state's courts of general jurisdiction," whether Federal Rule of Civil Procedure 4(k)(2) can establish personal jurisdiction. *Id.* at 10; *see* Fed. R. Civ. P. 4(k)(2)(A).

   i. *The D.C. Long-Arm Statute*

   The District of Columbia's long-arm statute authorizes a court in the District of Columbia to exercise personal jurisdiction over a non-resident defendant under a set of enumerated circumstances. D.C. Code § 13-423. Section 13-423(a) provides that "[a] District of Columbia court may exercise personal jurisdiction over a person, who acts directly or by an agent, as to a claim for relief arising from the person's --

   (1) transacting any business in the District of Columbia;

   (2) contracting to supply services in the District of Columbia;

---

6 28 U.S.C. §1330(b) does not apply to this analysis; this statute only provides for "[p]ersonal jurisdiction over *a foreign state*." 28 U.S.C. § 1330(b) (emphasis added).

(3)  causing tortious injury in the District of Columbia by an act or omission in the District of Columbia;

(4)  causing tortious injury in the District of Columbia by an act or omission outside the District of Columbia if he regularly does or solicits business, engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed, or services rendered, in the District of Columbia;

(5)  having an interest in, using, or possessing real property in the District of Columbia;

(6)  contracting to insure or act as surety for or on any person, property, or risk, contract, obligation, or agreement located, executed, or to be performed within the District of Columbia at the time of contracting, unless the parties otherwise provide in writing; or

(7)  marital or parent and child relationship in the District of Columbia . . . .”

D.C. Code § 13-423.  Plaintiff does not urge the Court to find that any of these provisions apply, and the complaint does not allege any facts with respect to personal jurisdiction beyond the conclusory statement that “[t]his Court has jurisdiction over this matter and over Defendants pursuant to 28 U.S.C. §§ 1330(a), 1330(b), 1331, 1332(a)(2) and 1605A(a)(1), which create subject matter jurisdiction and personal jurisdiction for civil actions for personal injuries against State Sponsors of Terrorism and their officials, employees, and agents.”  Compl. ¶ 3.  But none of those provisions “create” personal jurisdiction over individuals who are not located in the forum state.

Subsection (a)(4) is the only provision of the long-arm statute that would arguably apply. It permits a court in the District of Columbia to exercise personal jurisdiction over a person whose acts or omissions outside the District are alleged to have caused tortious injury in the District, “but it requires something more than effects in the District caused by acts done elsewhere.”  *Crane v. Carr*, 814 F.2d 758, 761 (D.C. Cir. 1987).  A court may exercise personal jurisdiction over a non-resident defendant pursuant to this provision only if:

> he regularly does or solicits business, engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed, or services rendered, in the District of Columbia.

D.C. Code § 13-423(a)(4).  As the D.C. Circuit put it:

> [U]nder (a)(4), the act outside/*impact inside* the form is the basis for drawing the case into the court, but because the harm-generating act (or omission) occurred outside, the statute calls for something more.  The "something more" or "plus factor" does not itself supply the basis for the assertion of jurisdiction, but it does serve to filter out cases in which the inforum impact is an isolated event and the defendant otherwise has no, or scant, affiliations with the forum.

*Crane,* 814 F. 2d. at 763 (emphasis in original).  Thus, the words "regularly," "persistent," and "substantial" are all fundamental to this provision, as there must be "some other reasonable connection between the District and the defendant."  *Founding Church of Scientology of Washington, D.C. v. Verlag*, 536 F.2d 429, 432 (D.C. Cir. 1976), *abrogated on other grounds by Moncrief v. Lexington Herald-Leader Co.*, 807 F.2d 217, 224 (D.C. Cir. 1986).

Plaintiff readily acknowledges that defendants do not have commercial contacts with the forum state:  he explains that "Khamenei and Salami are both individually identified as subject to secondary sanctions by the U.S. Department of the Treasury's Specially Designated Nationals and Blocked Persons List."  Mot. at 9.  Plaintiff maintains, though, that the fact that sanctions have been imposed demonstrates that the Individual Defendants *intended* to "purposefully engage with and have a direct impact upon the United States."  *Id.* at 9–10.  But even if one could draw that attenuated inference from the actions of the U.S. government, it is hardly sufficient to show that either of the Individual Defendants meets any of the criteria in section (a)(4) or "engages in any other persistent course of conduct" in this forum, the District of Columbia.  Therefore, the D.C. long-arm statute does not afford a basis for the exercise of personal jurisdiction over the Individual Defendants.

ii.   *Federal Rule of Civil Procedure 4(k)(2)*

There is a provision, though, that governs federal claims that fall outside the boundaries of state court jurisdiction.  Federal Rule of Civil Procedure 4(k)(2) provides that "serving a summons or filing a waiver of service establishes personal jurisdiction over a defendant[,]" but that is the case only if "exercising jurisdiction is consistent with the United States Constitution and laws." Fed. R. Civ. P. 4(k)(2)(B).

Plaintiff has submitted evidence showing that the Individual Defendants were served with process.  RE:  Request for Serv. of Process on Defs. in *Diba v. Islamic Republic of Iran*, Civil Action No. 1:20-cv-00240, Ex. 5 to Mot. [Dkt. # 26-7]; Return of Serv., Ex. 6 to Mot. [Dkt. # 26-8].  This satisfies the procedural requirement of serving a summons, but the question remains as to whether the exercise of jurisdiction would satisfy due process.

"The Due Process Clause of the Fourteenth Amendment constrains a [forum's] authority to bind a nonresident defendant to a judgment of its courts."  *Walden v. Fiore*, 571 U.S. 277, 283 (2014); *see Daimler AG v. Bauman*, 571 U.S. 117, 125 (2014) (the exercise of personal jurisdiction must "comport[] with the limits imposed by federal due process").  Although the defendant does not need to be physically present in the forum, the defendant must have "certain minimum contacts . . . such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'"  *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945), quoting *Milliken v. Meyer*, 311 U.S. 457, 463 (1940).

The due process clause also requires that individuals "have 'fair warning that a particular activity may subject them to the jurisdiction of a foreign sovereign.'"  *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985) (brackets omitted), quoting *Shaffer v. Heitner*, 433 U.S. 186, 218 (1977) (Stevens, J., concurring).  "Where a forum seeks to assert specific

jurisdiction over an out-of-state defendant who has not consented to suit there, this fair warning requirement is satisfied if the defendant has purposefully directed his activities at residents of the forum and the litigation results from alleged injuries that arise out of or relate to those activities." *Mwani*, 417 F.3d at 12, citing *Burger King*, 471 U.S. at 472 (internal quotation marks and citations omitted).

When applying these principles in the context of Rule 4(k)(2), the inquiry becomes whether the defendant had minimum contacts with the United States as a whole, as opposed to the forum state in particular. *Mwani*, 417 F.3d at 11, citing *ISI Int'l, Inc. v. Borden Ladner Gervais LLP*, 256 F.3d 548, 552 (7th Cir. 2001); *see also Triple Up Limited v. Youku Tudou Inc.*, No. 17-7033, 2018 WL 4440459, at *2 (D.C. Cir. July 17, 2018) (finding there would be personal jurisdiction over defendant, a Chinese company, if its suit-related conduct created a substantial connection with the United States).  "[S]o long as a defendant does not concede to jurisdiction in another state, a court may use 4(k)(2) to confer jurisdiction." *Mwani*, 417 F.3d at 11, quoting *Adams v. Unione Mediterranea Di Sicurta*, 364 F.3d 646, 651 (5th Cir. 2004).

A court, of course, may exercise general jurisdiction over a resident defendant. *See Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011).  And it may, under some circumstances, exercise what is referred to as "specific jurisdiction," and adjudicate "issues deriving from, or connected with, the very controversy that establishes jurisdiction." *Id.* (citation omitted).  Ordinarily, to determine whether there is specific jurisdiction and a defendant has "minimum contacts" with the forum, a court must analyze whether "the defendant's suit-related conduct [] create[s] a substantial connection with the forum State" by assessing (1) whether "the relationship [] arise[s] out of contacts that the 'defendant *himself*' creates with the forum State," and (2) "the defendant's contacts with the forum State itself, [and] not the defendant's contacts

with persons who reside there." *Walden*, 571 U.S. at 284–85 (emphasis in original). In sum, "the plaintiff cannot be the only link between the defendant and the forum." *Id.* at 285.

Plaintiff rests his argument on the fact that the Individual Defendants are subject to sanctions in the United States. He submits that "[b]ecause the issues in this case concern the subject matter of U.S. sanctions against [the Individual] Defendants and the torture of Mr. Diba as an accused foreign agent rather than unrelated personal claims against [the Individual] Defendants, this Court should find that it has personal jurisdiction over the [I]ndividual Defendants with regard to these claims." Mot. at 10. While it may be the case that U.S. sanctions are meant to punish and deter the very sort of conduct and torture that plaintiff endured, this does not satisfy the test for when the conduct alleged in a suit can be deemed to have created a relationship with the nation as a whole or any individual state:  plaintiff does not point to a relationship between the Individual Defendants and this country that arose out of contacts the Individual Defendants themselves created, and the Individual Defendants' case-related contacts were not with the United States, but rather, with an individual who came to reside in this country thereafter. *See Walden*, 571 U.S. at 284. In other words, in this case, the plaintiff is "the only link between the defendant and the forum." *Id.*

Plaintiff has not shown that the Individual Defendants engaged in any conduct that was "purposefully directed" toward the United States, *see Mwani*, 417 F.3d at 12–13 – the most he can say is that one can assume that they must have intended to do so before they were sanctioned. Nor has plaintiff alleged other facts that could show that the Individual Defendants could have reasonably anticipated being haled into court in this forum.

The facts alleged and shown by plaintiff do not establish that the Individual Defendants had the necessary minimum contacts with any state to satisfy the constitutional analysis, and

therefore, the Court lacks personal jurisdiction over Khamenei or Salami for purposes of the only remaining count, Count V, which was brought against them as individuals under the TVPA.

## CONCLUSION

Given the absence of subject matter jurisdiction over the FSIA claims and the lack of personal jurisdiction over the two individuals sued in the TVPA claim, the Court is required by law to **DENY** plaintiff's motion for default judgment [Dkt. # 26].

A separate order will issue.

AMY BERMAN JACKSON
United States District Judge

DATE:  March 31, 2022